**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

EVANSTON INSURANCE COMPANY,

        Plaintiff,

v.                                 Case No. 6:15-cv-486-Orl-37DAB

DIMUCCI DEVELOPMENT CORP.
OF PONCE INLET, INC.; and
TOWERS GRANDE CONDOMINIUM
ASSOCIATION,

        Defendants.

_____

## ORDER

This cause is before the Court on the following:

1.     Defendant/Counter-Plaintiff, DiMucci Development Corporation of Ponce Inlet, Inc.'s, Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 69), filed May 13, 2016;

2.     Plaintiff Essex Insurance Company's Motion for Final Summary Judgment (Doc. 72), filed May 13, 2016;

3.     Defendant/Counter-Plaintiff, DiMucci Development Corporation of Ponce Inlet, Inc.'s, Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 77), filed May 27, 2016; and

4.     Essex Insurance Company's Response in Opposition to DiMucci Development Corp. of Ponce Inlet, Inc.'s Motion for Summary Judgment (Doc. 81), filed May 27, 2016.

## BACKGROUND[1]

In this action, Essex Insurance Company ("**Insurer**")[2] seeks a declaration that it does not have a duty to defend or indemnify its insured—DiMucci Development Corporation of Ponce Inlet, Inc. ("**Insured**")—for claims asserted in an underlying state court action arising from construction defects to a condominium ("**the Underlying Action**"). (*See* Doc. 42.)

## I.     The Insurance Policies

In 2003, 2004, and 2005, Insurer and Insured, a company that builds condominiums and townhomes, entered into three successive commercial general liability insurance policies ("**CGL Policies**").[3] (Doc. 69, pp. 45–85, 87–128, 130–181.) The CGL Policies covered, *inter alia*, "'property damage' . . . caused by an 'occurrence' that [took] place in the 'coverage territory'" and "occur[red] during the policy period."[4]

---

[1] For the purpose of resolving a summary judgment motion, the Court ordinarily presents the facts in the light most favorable to the non-moving party. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). Here, however, both parties move for summary judgment, and the material underlying facts are not in dispute—rather, it is only the inferences drawn from those facts that are in dispute. Therefore, in the following section the Court presents the undisputed facts from the record evidence.

[2] Following a merger, Evanston Insurance Company ("**Evanston**") succeeded Essex Insurance Company. (Doc. 98, p. 2.) Accordingly, on September 1, 2016, the Court granted Insurer's motion to substitute Evanston as Plaintiff. (Doc. 99.)

[3] The CGL Policies included: (1) Policy No. 03GLP1007086, effective from August 28, 2003, through August 28, 2004 ("**the First CGL Policy**"); (2) Policy No. 04GLP1007428, effective September 23, 2004, through September 23, 2005 ("**the Second CGL Policy**"); and (3) Policy No. 05GLP1007428, effective September 23, 2005, through September 23, 2006 ("**the Third CGL Policy**"). (Doc. 69, pp. 45, 87, 130.) The CGL Policies contain a number of the same provisions, but they are not identical.

The record does not expressly state which CGL Policy is applicable to the instant action.

[4] The Third CGL Policy also includes a Designated Operations Coverage Endorsement, which states that the "insurance applies only to . . . 'property damage' arising out of" Insured's operations as a general building contractor. (*See id.* at 167.)

(Doc. 69, pp. 71, 115, 169.)

The CGL Policies provide the following definitions:

5.      "Coverage territory" means:

   a.   The United States of America (including its territories and possessions), Puerto Rico and Canada;

. . .

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . .

16.     "Property damage" means:

   a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

. . .

20.     "Your work" means:

   a.   Work or operations performed by you or on your behalf; and

   b.   Materials, parts or equipment furnished in connection with such work or operations

(*Id.* at 80, 82, 124, 126, 178, 180.) The CGL Policies do not define the term "accident"

within the definition of "occurrence." (*See id.* at 45–85, 87–128, 130–181.)

The CGL Policies also provide that "[Insurer] will pay those sums that the Insured

becomes legally obligated to pay as damages because of . . . 'property damage' to which this Insurance applies." (*Id.* at 71, 115, 169.) The Insurer has "the right and duty to defend any 'suit' seeking those [property] damages." (*Id.*) The CGL Policies also contain an exclusion for damage to "your work"—that is, Insured's work on the Towers Grande—as follows:

> ***l*. Damage to Your Work**
>
> "Property Damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard"
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor ("**Your Work Exclusion**")

(*Id.* at pp. 73, 117, 171.)

## II. The Underlying Action[5]

Insured constructed the Towers Grande Condominium—a 132-condominium unit ("**the Towers Grande**")—in Volusia County, Florida. (*Id.* at 24–26.) Insured was the record owner, builder, developer, and seller of the Towers Grande. (*Id.* at 26.)

In 2012, the Towers Grande Condominium Association, Inc. ("**the Association**") initiated the Underlying Action alleging that Insured's failure to construct the Towers Grande properly and adequately resulted in building defects and deficiencies. (*Id.* at 24, 26.) Specifically, the Association identified the following damages:

A. <u>Roof:</u> Trapped moisture, bad flashing, missing coping caps, roof leaks, poor scupper installation and code issues with scuppers

---

[5] The following facts are taken from the operative complaint in the Underlying Action. (*See id.* at 24–38.)

B.   <u>Generator Exhaust Pipe:</u> Exhaust becomes trapped and creates dangerous condition

C.   <u>HVAC:</u> Design of piping and condensation lines create excessive moisture causing severe leaking

D.   <u>Water intrusion and Decking/Structural issues:</u> Failure of waterproofing, sloping and/or joint issues with sealant allowing water into units and structural damage to decking and rebar below. Failure of expansion caulking and sealant allowing water intrusion to concrete below balconies and walkways, and creating popped/cracked tile for dangerous conditions. Complete failure of ground floor decking on entire front building driveway. Leaking into garage, waterproofing above garage, cracking, caving, splitting seams and joints, pool deck foundation separating and falling.

(*Id.* at 25–26.) As such, the Association brought several claims arising under negligence, breach of implied warranties, and violations of the Florida Building Code against Insured—in its role as both developer and contractor of the Towers Grande—and Insured's roofing subcontractor, Wayne's Roofing and Sheet Metal ("**Subcontractor**"). (*Id.* at 27–38.) In addition to the construction defects and deficiencies themselves, the Association contends that Insured's faulty work led to additional damages. (*See id.*) The Underlying Action remains ongoing.

## III.   The Instant Action

On September 17, 2014, Insurer filed this declaratory judgment action in the U.S. District Court for the Northern District of Illinois ("**the Illinois Court**"). (*See* Doc. 1.) The Illinois Court transferred the case to this Court on March 10, 2015, pursuant to 28 U.S.C. § 1404(a). (Doc. 22.) In the operative Complaint, Insurer seeks a judgment declaring that it has no duty to defend or indemnify Insured in the Underlying Action on grounds that either its duty never arose or a policy exclusion bars coverage. (Doc. 42.) In its Answer, Insured filed a counterclaim seeking a declaratory judgment that Insured did indeed have

a duty to defend and indemnify Insured in the Underlying Action. (Doc. 54.)

The parties have filed Cross Motions for summary judgment ("**the Cross Motions**"), specifically contesting whether Insurer has a duty to defend and indemnify Insured. (*See* Docs. 69, 72.) Each party responded to the respective Cross Motions (Docs. 77, 81), and the matters are ripe for adjudication.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant has two options: (1) the movant may simply point out an absence of evidence to support the non-moving party's case; or (2) the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *U.S. v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325).

"The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at

1115–17). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248) (1986)).

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

An insurer's duty to defend hinges on the legal effect of the provisions within the insurance policy, the interpretation of which is a matter of law for the Court to decide and is, therefore, suitable for summary judgment. *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1321 (S.D. Fla. 2010) (citing *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.,* 757 F.2d 1172, 1174 (11th Cir. 1985)).

## DISCUSSION

The instant Cross Motions present two discrete issues: (1) first, whether Illinois or Florida substantive law governs the interpretation of the CGL Policies; and (2) second, whether Insurer has a duty to defend Insured in the Underlying Action based on the applicable state law.[6]

Insurer argues that: (1) Illinois law applies to the interpretation of the CGL Policies; and (2) under Illinois law, Insurer does not have a duty to defend or indemnify Insured

---

[6] The Court previously bifurcated and stayed the issue of whether Insurer has a duty to indemnify Insured. (*See* Doc. 95.)

because the CGL Policies do not cover the claims in the Underlying Action. (Doc. 72.) In contrast, Insured contends that: (1) Florida law governs the interpretation of the CGL Policies; and (2) under Florida law, Insurer has a duty to defend and indemnify Insured in the Underlying Action because the CGL Policies cover such claims. (Doc. 69; *see also* Doc. 77.) Upon consideration, the Court concludes that: (1) Florida law governs the interpretation of the CGL Policies; and (2) Insurer does not have a duty to defend Insured.

## I.    Choice-of-Law Analysis

As a threshold matter, the Court must determine whether Illinois or Florida substantive law governs the interpretation of the CGL Policies. Typically, a federal district court applies the choice-of-law rules of the forum state. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 243 n.8 (1981) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). "However, where a case is transferred pursuant to 28 U.S.C. § 1404(a), [a federal district court] must apply the choice-of-law rules of the [s]tate from which the case was transferred." *Id.*; *see also Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (holding that, "in cases . . . where the defendant[] seek[s] transfer [under § 1404(a)], the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue"); *Videojet Techs. Inc., v. Garcia*, No.-8:07-CV-1407-T-30MAP, 2008 WL 2415042, at *3 (M.D. Fla. June 12, 2008) (citing *Van Dusen*, 376 U.S. at 639) ("Because this action was filed in Illinois, Illinois is in effect the 'forum state,' regardless of the venue change, and [the transferee court] therefore must apply choice-of-law principles as the federal court in Illinois would have had no transfer been granted."). As the instant action was transferred to this Court from the Illinois Court pursuant to § 1404(a) (*see* Doc. 22, pp. 4–

5), the Court applies Illinois choice-of-law principles to the parties' dispute.

In the absence of an express choice-of-law provision,[7] Illinois utilizes the "most significant contacts" test ("**the Significant Contacts Test**") to determine which state law applies to insurance contracts. *Westchester Fire Ins. v. G. Heileman Brewing Co.*, 747 N.E.2d 955, 961 (Ill. App. Ct. 2001). Under the Significant Contacts Test, the Court must consider the following six nondispositive factors: (1) "the location of the subject matter"; (2) "the place of delivery of the contract"; (3) "the domicile of the insured or of the insurer"; (4) "the place of the last act to give rise to a valid contract"; (5) "the place of performance"; and (6) "[any] other place bearing a rational relationship to the general contract" (collectively, "**the *Lapham-Hickey* Factors**").[8] *Id.* (quoting *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995)). The *Lapham-Hickey* Factors "are not all of equal significance[,] [and] [t]he weight to be accorded each [factor] depends upon the issue involved." *Emerson Elec. Co. v. Aetna Cas. & Sur. Co.*, 743 N.E.2d 629, 640 (Ill. App. Ct. 2001). Further, the *Lapham-Hickey* Factors do not always "yield a definitive result." *Westchester Fire*, 747 N.E.2d at 962.

The Court will address each of the *Lapham-Hickey* Factors in turn.[9]

---

[7] The CGL Policies do not contain an express choice-of-law provision.

[8] The parties agree that: (1) Illinois choice-of-law rules apply to the CGL Policies; and (2) the Court should employ the Significant Contacts Test and consider the *Lapham-Hickey* Factors to determine whether Illinois or Florida law governs the interpretation of the CGL Policies. (*See* Doc. 72, pp. 6–7; Doc. 77, pp. 2–3.)

[9] The parties did not engage in any formal discovery. As such, the Court was forced to reach a conclusion based on the limited record before it. In particular, the parties submit competing affidavits in support of their position, specifically regarding unnamed party Hayward Brown, Inc.'s involvement in procuring the CGL Policies for Insured in Florida. (*See* Doc. 69, pp. 40–43; Doc. 80-1.) Neither of the competing affidavits is substantiated by any additional evidence and they effectively neutralize one another. Thus, they did not add any value to the Court's consideration of this legal issue.

**A.      Location of Subject Matter**

"The location of the subject matter [for insurance contracts] is the location of the risk insured by the policy." *Emerson Elec.*, 743 N.E.2d at 640. Although "the location of the insured risk is often seen as the most important factor in this sort of analysis, that is not the case where . . . the risk locations are scattered throughout several states." *Id.* To promote the consistent interpretation of insurance policies, *See Lapham-Hickey*, 655 N.E.2d at 845, when the subject matter or insured risk is located in more than one state, "the location of the risk insured by an insurance policy[] is entitled to little weight." *Emp'rs Ins. of Wausau v. Ehlco Liquidating Trust*, 723 N.E.2d 687, 694 (Ill. App. Ct. 1999)**;** *see also Emerson Elec.*, 743 N.E.2d at 639 (concluding that "application of the law of the site would [not] open the policies at issue to possibly inconsistent interpretation depending upon the individual law to be applied at each individual site.")

Here, the CGL Policies covered risks nationwide.[10] (*See* Doc. 69, pp. 71, 80, 115, 124, 169, 178.) Thus, ordinarily, the Court would afford little weight to this factor. *See Wausau*, 723 N.E.2d at 694. However, because there is no evidence that the CGL Policies covered any building aside from the Towers Grande in Florida, the Court concludes that—for purposes of this action—the "principal" risk is located in Florida. *See Soc'y of Mount Carmel v. Nat'l Ben Franklin Ins. Co. of Ill.*, 643 N.E.2d 1280, 1287 (Ill. App. Ct. 1994) (quoting Restatement (Second) of Conflict of Laws § 193 cmt. b (1971) (emphasizing the importance of the "'location of the insured risk'" in a choice-of-law analysis, "'provided that the risk can be located, at least principally in a single state[,]'"

---

[10] The Third CGL Policy excluded coverage for Insured's operations in eleven states. (*See* Doc. 69, p. 161.) Neither Florida nor Illinois was excluded. (*See id.*) This exclusion does not appear in the First CGL Policy or the Second CGL Policy.

even when coverage is provided for "multiple risks located in several states").)

The instant action is distinguishable from those cases in which courts afforded little weight to the location of the subject matter, particularly because, in those cases, the insurance policies not only provided coverage for risks located in more than one state, but the evidence clearly illustrated that risks actually existed in more than one state. *See, e.g.*, *Alliance Gen.*, 2000 WL 968038, at *1, *3 (affording little to no weight to the location of the subject matter when the record evidenced that the insured risk, which was a household cleaning product, was distributed to all fifty states).[11]

Ultimately, the record is silent as to the existence of any buildings constructed— that is, any insured risks—other than in Florida. As such, the Court concludes that the application of Florida law would not "open [the CGL Policies] to . . . different views of the law." *See Maremont Corp.*, 681 N.E.2d at 552. Further, "'the location of the insured risk enjoys greatest significance when an immovable object is involved[.]'"*Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co.*, 580 F. Supp. 2d 678, 686 (N.D. Ill. 2008) (quoting Restatement (Second) of Conflict of Laws § 193 cmt. b (1971)). Similar to the insured risk in *Mount Carmel*, the Towers Grande is a "physical 'insured risk'" with a permanent

---

[11] *Accord Lapham-Hickey*, 655 N.E.2d at 843, 845; *Liberty Mut. Fire Ins. Co. v. Woodfield Mall, L.L.C.*, 941 N.E.2d 209, 216, 218 (Ill. App. Ct. 2010); *Westchester Fire*, 747 N.E.2d at 964; *Emerson Elec.*, 743 N.E.2d at 640; *Wausau*, 723 N.E.2d at 690; *Maremont Corp. v. Cheshire*, 681 N.E.2d 548, 549–50 (Ill. App. Ct. 1997).

The Court is unpersuaded by Insurer's reliance on *Perma-Pipe, Inc. v. Liberty Surplus Ins. Corp.*, 38 F. Supp. 3d 890 (N.D. Ill. 2014). (*See* Doc. 72, pp. 6–9.) *Perma-Pipe* involved property damage in a single state—California—under a nationwide insurance contract; however, the court gave "little weight" to the location of the risk and ultimately applied Illinois law because the remaining *Lapham-Hickey* Factors—notably the insured's domicile, the location of the last act giving rise to the insurance contract, and location of performance—all favored Illinois law. 38 F. Supp. 3d at 893–95. As the Court will detail *infra*, the totality of the *Lapham-Hickey* Factors demonstrates that Florida "has the most significant contacts with [the CGL Policies]." S*ee id.* at 895.

location. *See id.* (quoting *Mount Carmel*, 643 N.E.2d at 1287).[12] Accordingly, the Court finds that the location of the risk favors the application of Florida law and is due to be afforded considerable weight in the analysis.

### B.     Place of Delivery of the Contract

"'[I]n the absence of proof as to where the policy was delivered[,] it is presumed that delivery took place at the insured's residence.'" *Emerson Elec.*, 743 N.E.2d at 640 (quoting 2 Couch on Insurance 2d § 16:6 at 492 (rev. 1984)). Here, the record lacks proof of the location of delivery. On the one hand, Insurer argues that delivery occurred in Illinois. In support, it points to Insured's identification of an Illinois address on the CGL Policies as a location of premises that Insured owned, rented, or occupied ("**the Illinois Address**"). (*See* Doc. 72, p. 8; *see also* Doc. 69, pp. 46, 88, 131.) On the other hand, Insured contends that delivery took place in Florida—the location of its principal place of business. (*See* Doc. 77, p. 4.)

The record is devoid of evidence of the significance of the Illinois Address to the delivery of the CGL Policies. Indeed, nothing in the record suggests that the CGL Policies were mailed to the Illinois Address. *See Liberty Mut.*, 941 N.E.2d at 219 (rejecting the party's argument that the insurance contract was mailed to the insured's address as listed in the policy in the face of conflicting evidence). Moreover, the Court is not convinced that Insured's actions with respect to the building, developing, and selling of the Towers Grande emanated from the Illinois Address. First, Insured is incorporated in Florida (*see*

---

[12] The Court notes that *Mount Carmel* involved "discrete" risks located in multiple states, each of which "could be identified with a specific state." *See Alliance Gen. Ins. Co. v. Covington Enters., Inc.*, No. 99-2585, 2000 WL 968038, at *3 n.4 (7th Cir. July 12, 2000). Nevertheless, the Court finds the *Mount Carmel* rationale persuasive here in light of the absence of evidence that the CGL Policies covered additional buildings.

Doc. 77, pp. 11–13); second, Insured's principal place of business is in Florida (*id.*); and third, the insured building—the Towers Grande—is located in Florida (*see* Doc. 69, p. 24). Overall, however, the insufficiency of the record evidence precludes a determination as to the place of delivery of the CGL Policies. Thus, this factor is not determinative of the choice-of-law analysis.

### C.     Domicile of Insured or Insurer

Courts have given special emphasis under the *Lapham-Hickey* Factors to an insured's domicile. *See Emerson Elec.*, 743 N.E.2d at 642 (concluding that "the role of the domicile of the insured should be a dominant [fact]").[13] "[A]ccording to Illinois law, a corporation is always domiciled in its state of incorporation." *Gadzinski v. Chrysler Corp.*, No. 00 C 6229, 2001 WL 629336, at *2 n.4 (N.D. Ill. May 29, 2001) (citing *Martin v. Cent. Trust Co. of Ill.*, 159 N.E. 312, 317 (Ill. 1927)). It is uncontested that Insured is incorporated in Florida and Insurer is incorporated in Delaware. (*See* Doc. 77, pp. 11–13, 15–16; *see also* Doc. 42, ¶¶ 6, 8; Doc. 77, p. 5.) Ergo, Insured is domiciled in Florida and Insurer is domiciled in Delaware. *See Gadzinski*, 2001 WL 629336, at *2 n.4. Importantly, neither party is domiciled in Illinois. Therefore, this factor favors the application of Florida law.

### D.     Place of Last Act Giving Rise to Contract

"[T]ypically, [the] last act required to make [an insurance] policy effective takes

---

[13] Although Insured's domicile might not have played as "active, dominant, and dynamic [of a] role in the procurement of [the CGL Policies]" as the insured's domicile did in *Emerson Elec.*, 743 N.E.2d at 642, the Court nonetheless attaches significance to this factor because the record lacks information regarding the other *Lapham-Hickey* Factors—namely where the CGL Policies: (1) were delivered; (2) became effective; and (3) would be performed.

place in 'the state where the policy is delivered and the premiums are paid[.]'" *Emerson Elec.*, 743 N.E.2d at 641 (quoting 4 Appleman on Insurance 2d § 21.6 at 278 (1998)). As previously addressed, the Court is unable to determine the place of delivery. Further, absent evidence of where the premiums were paid, the Court presumes that the payments originated from Insured's headquarters. *See Liberty Mut.*, 941 N.E.2d at 219 ("[T]he record does not definitely indicate where premiums were paid, but the location of the insured's headquarters in Ohio . . . suggests the payments emanated in Ohio."). As Insured's headquarters—that is, its principle place of business—are in Florida (*see* Doc. 77, pp. 11–13), this factor supports the application of Florida law.

### E.    Place of Performance

"[A] major factor which courts look to in determining the place of performance of an insurance policy is the place where the claim is to be paid." *Emerson Elec.*, 743 N.E.2d at 641. "Where there is no express agreement as to the place of performance, it may be determined according to the intent of the parties, namely, the intended place of the insurer's payment of claims under the policy." *Id.* When such intent is uncertain, courts "look to the state where the insured is located"—that is, where its headquarters are located. *Id.*

The CGL Policies do not affirmatively demonstrate where any claims would be paid. (*See* Doc. 69, pp. 45–85, 87–128, 130–181.) In the face of such doubt, the Court finds that, for purposes of this action, the place of performance is in Florida—where Insured is headquartered.[14] *See Emerson Elec.*, 743 N.E.2d at 641 ("[T]he place of

---

[14] The Court is not persuaded by Insurer's argument that the Illinois Address listed on the CGL Policies is determinative of the place of performance. (*See* Doc. 72, p. 8.) Here, the Court affords more weight to the Insured's headquarters rather than an address

performance would clearly favor Missouri, where [the insured's] headquarters is located.").

### F.      Other Places with a Rational Relationship to the Contract

The Significant Contacts Test permits the Court to consider any other place that has a rational relationship with the CGL Policies. *See Westchester Fire*, 747 N.E.2d at 961. Although it is not "dispositive to [the] analysis[,]" the Court may afford weight to the location of the Underlying Action. *See id.* at 962 (stating that although "the place of the underlying suit cannot be equated with the location of the subject matter or [the] insured risk[,] [t]he location of the underlying action can, however, be considered as an additional relevant factor"); *see also Ace Rent-A-Car*, 580 F. Supp. 2d at 687 (considering the location of the underlying litigation as a factor in the choice-of-law analysis). As such, the Court affords weight to the location of the Underlying Action in Volusia County, Florida. (*See* Doc. 69, pp. 24–38.)

Moreover, the Court notes that Insurer could have "easily protect[ed]" itself and ensured that Illinois law governed the CGL Policies by expressly including an Illinois choice-of-law provision in the CGL Policies. *See Am. Builders & Contractors Supply Co. v. Home Ins. Co.*, No. 96 C 5041, 1997 WL 43017, at *2 n.5 (N.D. Ill. Jan. 28, 1997).

Accordingly, consideration of the *Lapham-Hickey* Factors supports a finding that Florida has the most significant contacts with the CGL Policies. Thus, Florida substantive law governs the interpretation of the CGL Policies.

## II.      Duty to Defend Analysis

Having found that Florida law controls the interpretation of the CGL Policies, the

---

signifying that Insured merely owned, rented, or occupied premises located in Illinois.

Court now turns to the issue of whether Insurer has a duty to defend Insured in the Underlying Action.

In Florida, an insurer's duty to defend arises "when the complaint alleges facts that fairly and potentially bring the suit within policy coverage." *Hartford Accident & Indem. Co. v. Beaver*, 466 F.3d 1289, 1292 (11th Cir. 2006) (quoting *Jones v. Fla. Ins. Guar. Ass'n*, 908 So. 2d 435 (Fla. 2005)); *see also James River Ins. Co. v. Ground Down Eng'g Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008) (finding that a duty to defend rests "on the facts and legal theories alleged in the pleadings and claims against the insured"). "If an examination of the allegations of the complaint leaves any doubt regarding the insurer's duty to defend, the issue is resolved in favor of the insured." *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580–81 (11th Cir. 1995). Conclusory "buzz words" in the complaint and inferences, however, are insufficient to trigger coverage. *See State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004); *Spree Vacations, Inc. v. Orion Ins. Co.*, 659 So. 2d 419, 421–22 (Fla. 3d DCA 1995).

Additionally, a court must examine the plain language of the insurance policy. *Chestnut Assocs., Inc. v. Assurance Co. of Am.*, 17 F. Supp. 3d 1203, 1209 (M.D. Fla. 2014). "This rule is called the 'eight corners rule,' a reference to the four corners of the policy and the four corners of the complaint." *Id.*[15] As with the complaint, any ambiguity

---

[15] Florida law has recognized limited exceptions to the so-called "eight corners rule." *See, e.g.*, *Composite Structures, Inc.*, 560 F. App'x 861, 865 (11th Cir. 2014) (finding that "there are some natural exceptions to [the eight corners rule] where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the complaint."). The instant case, however, is not exceptional as the parties do not dispute the material facts but, rather, only the interpretation of such facts. The Court, therefore, limits its examination to the boundaries of the CGL Policies and the complaint in the Underlying Action ("**State Court Complaint**").

in the interpretation of a CGL policy "must be interpreted liberally in favor of the insured and strictly against the drafter." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).

An insurer's duty to defend the entire suit remains intact even if the underlying complaint contains more than one claim, some falling within and some outside the policy coverage. *Tropical Park, Inc. v. U.S. Fid. & Guar. Co.*, 357 So. 2d 253, 256 (Fla. 3d DCA 1978). However, where the underlying complaint clearly brings the claims against an insured within a policy exclusion, an insurer is relieved of its duty to defend. *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So. 2d 810, 815 (Fla. 1st DCA 1985). Courts strictly construe these policy exclusions against an insurer. *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 226 F. Supp. 2d 1326, 1340 (M.D. Fla. 2002).

Accordingly, the Court must determine (1) whether the State Court Complaint "fairly and potentially" brings the Underlying Action within the coverage of the CGL Policies; and (2) if so, whether any policy exclusions clearly extinguish Insurer's duty to defend.

### A.    Coverage for Faulty Workmanship

Florida law provides an excellent blueprint on which to construct the Court's analysis as to whether damages caused by defective work are an "occurrence" that caused "property damage" as defined in the CGL Policies.  The Court will consider each definition in turn.

### 1.    An "Occurrence"

Under Florida law, when a post-1986 CGL policy defines an "occurrence" as an "accident" but leaves the term "accident" undefined, coverage exists "not only for

'accidental events,' but also for injuries or damage neither expected nor intended from the standpoint of the insured." *U.S. Fire Ins. Co. v. J.S.U.B.*, 979 So. 2d 871, 883 (Fla. 2007) (quoting *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998)). "Thus, if the resulting damages are unintended, the resulting damage is accidental even though the original acts were intentional." *CTC Dev. Corp.*, 720 So. 2d at 1074; *see also Auto-Owners Ins. Co. v. Pozzi Window Co.*, 984 So. 2d 1241, 1243 (Fla. 2008), *aff'd in part*, 294 F. App'x 588, 590–91 (11th Cir. 2008) (per curiam) (reaffirming "that faulty workmanship that is neither intended nor expected from the standpoint of the contractor constitute[s] an 'accident' and, thus, an 'occurrence'"). The language of the CGL Policies also supports this interpretation as they exclude from coverage property damage "expected or intended from the standpoint of the insured." (Doc. 69, pp. 71, 115, 169.)

Here, the decisions in *J.S.U.B.* and *Pozzi* control the Court's analysis. *See Amerisure Mut. Ins. Co. v. Auchter Co.*, 673 F.3d 1294, 1306 (11th Cir. 2012); *see also Bradfield v. Mid-Continent Cas. Co.*, 143 F. Supp. 3d 1215, 1232–1236 (M.D. Fla. 2015). The CGL Policies define "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 69, pp. 82, 126, 180.)

Notwithstanding this principle, Insurer argues that the State Court Complaint fails to allege an "occurrence" or "accident" within the meaning of the CGL Policies because the alleged damages were "the rational and probable consequence" of Insured's actions and, therefore, were expected by Insured, thereby, rending such damages *non-accidental.* (Doc. 72, pp. 9–10.) However, Florida law has rejected this "'natural

consequences' or 'foreseeability'" analysis in the insurance contract context. *See J.S.U.B.*, 979 So. 2d at 883–884.

Upon review of the State Court Complaint, the Court concludes that Insured's defective work was an "occurrence" as defined by the CGL Policies. Based on the State Court Complaint, Insured did not expect nor intend the resulting structural damages caused by "water intrusion" and improper "ground floor decking." (Doc. 69, p. 26.)[16]

The Court, having found an "occurrence," must now determine whether such an occurrence caused "property damage," thereby triggering Insurer's duty to defend.

### 2.    "Property Damage"

Florida law has consistently held that CGL policies do not cover claims to repair or replace defective work but only cover claims for damage *caused by* defective work. *J.S.U.B.*, 979 So. 2d at 889–90; *see also Pozzi Window Co.*, 984 So. 2d at 1248; *LaMarche v. Shelby Mut. Ins. Co.*, 390 So. 2d 325, 326 (Fla. 1980) ("Rather than coverage and payment for building flaws or deficiencies, the policy instead covers damage caused by those flaws."); *see, e.g.*, *W. Orange Lumber Co. v. Ind. Lumbermens Mut. Ins. Co.*, 898 So. 2d 1147, 1148 (Fla. 5th DCA 2005) (finding no property damage when the only damage alleged was the cost of removing and replacing the wrong grade cedar siding installed).

Consequently, the Court must determine whether the State Court Complaint

---

[16] Insured also contends that the allegations in the State Court Complaint against Subcontractor also establish an "occurrence." (*See* Doc. 69, p. 17 n.4.) However, the general rule is that the duty to defend is determined solely from the allegations of the complaint *against the insured. Wilshire Ins. Co. v. Poinciana Grocer, Inc.*, 151 So. 3d 55, 57 (Fla. 5th DCA 2014).   Therefore, Insured cannot employ the allegations against Subcontractor to establish Insurer's duty to defend Insured.

alleges damages: (1) only for the cost of repairing or replacing Insured's defective work; or (2) to other property caused by Insured's alleged defective work. *See, e.g.*, *Bradfield*, 143 F. Supp. 3d at 1236–37 (finding no duty to defend where allegations of defective work were limited to claims for replacement of defective materials or defective work); *see also Auchter Co.*, 673 F.3d at 1309–10.

A single claim alleging property damage will trigger Insurer's duty to defend. Insurer contends that the State Court Complaint alleges damage only to the property that was the subject of the construction itself and, therefore, cannot constitute property damage under the CGL Policies. (Doc. 42, ¶ 52–54.) Insurer, however, incorrectly conflates the definition of "property damage" with the potential application of a policy exclusion. (*Id.*) Accepting Insurer's argument regarding the meaning of "property damage" would render the Your Work Exclusion meaningless, as there would be no need to exclude Insured's own work. *Shaw v. Nat. Union Fire Ins. Co. of Pittsburg, Pa.*, 605 F.3d 1250, 1252 (11th Cir. 2010) ("[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect.")

While the State Court Complaint is not a model of clarity, it alleges damages for more than the cost of repairing or replacing Insured's defective work. Specifically, the State Court Complaint alleges, *inter alia*, the following damages:

> Water intrusion and Decking/Structural issues:  Failure of waterproofing, sloping and/or joint issues with sealant allowing water into units and structural damage to decking and rebar below. Failure of expansion caulking and sealant allowing water intrusion to concrete below balconies and walkways, and creating popped/cracked tile for dangerous conditions. Complete failure of ground floor decking on entire front

> building driveway. Leaking into garage, waterproofing above garage, cracking, caving, splitting seams and joints, pool deck foundation separating and falling.

(*See* Doc. 69, p. 26.)

These allegations do not solely encompass Insured's defective work or defective components but also describe other property damaged by Insured's defective work—that is, damages caused by Insured's faulty work in applying waterproofing and sealant. (*Id.*) Indeed, the State Court Complaint states that the failure of "caulking and sealant allow[ed] water intrusion to concrete below balconies and walkways" causing "popped/cracked tile for dangerous conditions." (*Id.*) Further, according to the State Court Complaint, waterproofing issues caused the pool deck foundation to separate and fall. (*Id.*)

As the State Court Complaint alleges property damage to nondefective portions of the Towers Grande caused by Insured's defective work, and are not limited to repair or replacement of the latter, such allegations sufficiently establish an "occurrence" that caused "property damage" under the CGL Policies, thus triggering Insurer's duty to defend.

## B.   Policy Exclusions

Even where allegations in the complaint arguably fall within the policy coverage, an insurer has no duty to defend where the complaint shows that a policy exclusion applies. *Markel Int'l Ins. Co. v. Fla. W. Covered RV & Boat Storage, LLC*, 437 F. App'x 803, 804 (11th Cir. 2011); *see also Miranda Const. Dev. Inc. v. Mid-Continent Cas. Co.*, 763 F. Supp. 2d 1336, 1339 (S.D. Fla. 2010).

Insurer argues that even if the State Court Complaint establishes coverage, six

policy exclusions[17] relieve Insurer of its duty to defend. (Doc. 42, ¶¶ 55–80.) While not explicit in the instant Complaint, Insurer also appears to argue that the Your Work Exclusion applies because the only alleged damage is to the "property that was the subject of the construction project itself." (*Id.* ¶¶ 52–54; *see also* Doc. 81, pp. 16–17.) Upon consideration, the Court concludes that the allegations in the State Court Complaint bring the alleged property damage within the Your Work Exclusion, thus extinguishing Insurer's duty to defend.

In finding that an identical exclusion barred coverage, the court in *Miranda Construction* held that the applicable complaint contained no allegations of damage other than to the property itself. 763 F. Supp. 2d at 1339–40. As such, the court found that the damages were excluded under the policy's "your work" exclusion. *Id.*; *cf. Voeller Const. v. Southern-Owners Insurance Co.*, No. 8:13-cv-3169-T-30MAP, 2015 WL 1169420, at *3–4 (M.D. Fla. Mar. 13, 2015) (finding the "your work" exclusion inapplicable because the complaint alleged damage apart from the condominium at issue). As explained by the U.S. Court of Appeals for the Eleventh Circuit,

> [f]aulty workmanship to one part of a project (the roof, for example) can lead to damage to another part of the project (such as stucco walls which may leak from the faulty roof construction). In such an example, . . . the damage to the stucco walls would be "property damage" within the meaning of the policy, but would ordinarily be excluded under the "your work" exclusion [barring an exception].

*Auchter Co.*, 673 F.3d at 1310 (quoting district court with approval).

---

[17] Insurer reasons that the following exclusions bar coverage: (1) the prior incidents and prior construction defects exclusion; (2) the mold exclusion; (3) the subsidence/earth movement exclusion; (4) the contractual liability exclusion; (5) the breach of contract exclusion; and (6) the independent contractors conditional endorsement. The Court disagrees.

Here, Insured's work encompasses the overall construction of the Towers Grande, excluding the roof. Therefore, if the State Court Complaint alleges damage only to Insured's work, the Your Work Exclusion bars coverage. *But see, e.g.*, *Assurance Co. of Am. v. Lucas Waterproofing Co., Inc.* 581 F. Supp. 2d 1201, 1210 (finding the "your work" exclusion inapplicable because the company's "work" was limited to waterproofing, rather than the entire construction of the condominium, and, therefore, "coverage of damage to other parts of the subject property aside from the waterproofing" was not excluded.) The State Court Complaint alleges that Insured's defective work on a portion of the Towers Grande caused property damage to other portions of the building also constructed by Insured. Accordingly, the Your Work Exclusion bars coverage and, therefore, Insurer has no duty to defend Insured in the Underlying Action.

## CONCLUSION

The lack of clarity in the parties' briefing requires the Court to sift through the irrelevancies in the pleadings to enter judgment in accordance with the findings in this Order. As an initial matter, Plaintiff concedes that Defendant was an insured under all three CGL Policies (Doc. 81, p. 19); thus, the Court will enter judgment in favor of Defendant as to Count I of the Complaint (Doc. 42).

In its motion for summary judgment, Plaintiff argued exclusively for the application of Illinois law to the CGL Policies, thereby failing to address the application of Florida law. (*See* Doc. 72.) Having found that Florida law applies, the Court will enter judgment in favor of Defendant on Count XI of the Complaint and Count III of the Defendant's Counterclaims (Doc. 54, ¶¶ 24–49). Additionally, based on the Court's conclusion that the State Court Complaint alleges an "occurrence" that caused "property damage," the Court

will also enter judgment in favor of Defendant as to Counts II and III of the Complaint.

In Counts IV through X of its Complaint, Plaintiff seeks declaratory relief as to the effect of various endorsements and exclusions, which it contends release it from its duty to defend. (*See* Doc. 46, ¶¶ 55–86.) In its Answer, Defendant simply denied or stated that it was without knowledge as to the effect of the exclusions and endorsements relied on by Plaintiff. (*See* Doc. 54, ¶¶ 55–86.) However, having concluded that the Your Work Exclusion relieves Plaintiff of any duty to defend Defendant in the Underlying Action, the Court finds that Counts IV through X of the Complaint are due to be dismissed as moot. As such, the Court will enter judgment in favor of Plaintiff as to Count II of Defendant's Counterclaims. In light of these findings, Counts I and IV of Defendant's Counterclaims must also necessarily fall.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that**:**

1. Defendant/Counter-Plaintiff, DiMucci Development Corporation of Ponce Inlet, Inc.'s, Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 69) is **GRANTED IN PART AND DENIED IN PART**.

   a. To the extent that Defendant seeks summary judgment with respect to the application of Florida law to the CGL Policies, the Motion is **GRANTED**.

   b. In all other respects, the Motion is **DENIED**.

2. Plaintiff Essex Insurance Company's Motion for Final Summary Judgment (Doc. 72) is **GRANTED IN PART AND DENIED IN PART**

   a. To the extent Plaintiff seeks a declaration that it has no duty to

defend Defendant, the Motion is **GRANTED**.

b.    In all other respects, the Motion is **DENIED**.

3.    The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff Evanston Insurance Company and against Defendant DiMucci Development Corporation of Ponce Inlet, Inc. on Count II of Defendant's Counterclaims (Doc. 54, ¶¶ 31–36.)

4.    The Clerk is **DIRECTED** to enter judgment in favor of Defendant DiMucci Development Corporation of Ponce Inlet, Inc. and against Plaintiff Evanston Insurance Company on Counts I–III and XI of the Complaint (Doc. 42, ¶¶ 42–54, 87–90) and Count III of Defendant's Counterclaims (Doc. 54, ¶¶ 37–43).

5.    The Court **DISMISSES AS MOOT** Counts IV–X of the Complaint (Doc. 42, ¶¶ 55–86) and Counts I and IV of Defendant's Counterclaims (Doc. 42, ¶¶ 24–30, 44–49).

6.    The Clerk is **DIRECTED** to close the file and terminate all pending motions and deadlines.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on September 13, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record